## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| **v.** | * | **CRIMINAL NO. JKB-22-0041** |
| **JANICE MARTINA MASON,** | * | |
| **Defendant.** | * | |

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

## <u>MEMORANDUM</u>

Now pending before the Court is the Defendant's Motion to Exclude the Expert Testimony of Brian McVicker under Federal Rules of Evidence 702 and 403. (Mot. to Exclude Expert Test., ECF 36 ("Mot."); Mem. in Support of Mot. to Exclude Expert Test., ECF 37 ("Mem.").) The Court held a hearing pursuant to *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) on March 7, 2023. At the conclusion of the hearing, the Court suggested it was likely to deny Ms. Mason's motion under Rule 702, but left the Rule 403 issue for further consideration. The Court now holds that Mr. McVicker's testimony is generally admissible under Rule 702, but that his testimony comparing features of known and questioned impressions that ultimately resulted in conclusions of "inconclusive" is inadmissible under Rule 403. Accordingly, Ms. Mason's motion will be GRANTED in part and DENIED in part.

### I. Background

On February 3, 2023, a federal grand jury in the District of Maryland returned a single-count indictment charging Janice Martina Mason with second-degree murder in the death of Sharisse Carr. (*See* Indictment, ECF 1.) Specifically, Ms. Mason is accused of "intentionally running over" Ms. Carr with a 2013 Ford Expedition "in the early morning hours of November 24,

2021 on the Baltimore-Washington Parkway." (Opp'n to Mot. to Exclude Expert Test. at 1, ECF 40, ("Opp.").) According to the Maryland Office of the Chief Medical Examiner, "Ms. Carr died from multiple traumas to the body, to include but not limited to, skull fractures, rib fractures, a fracture to the thoracic spine, and a transected aorta." (*Id.*)

Due to the location of the fatality, the United States Park Police ("USPP") and the Federal Bureau of Investigation ("FBI") exercised jurisdiction over the incident. During the course of their investigation, the USPP seized a 2013 Ford Expedition belonging to Ms. Mason's mother, Janice Ethel Mason. (*Id.*) An Evidence Response Team from the FBI then processed the vehicle. (*Id.*) The team placed the vehicle on a lift, "took photographs, collected swabs from various parts including the damaged hood area, and lifted apparent shoe impressions from the front grille and parts of the underside of the Expedition." (*Id.*) The USPP and FBI also recovered various personal effects belonging to Ms. Carr, including the clothing she was wearing at the time of the incident. (*Id.* at 2.)

After processing the initial evidence collection, investigators submitted various evidentiary items to the FBI's Questioned Documents Unit, Footwear and Tire Group. This included the shoe impressions lifted from the front and underside of the Expedition; "digital images depicting the Expedition, including the front grille, the underside, and the tires; clothing items removed from the victim's body [including] her Jordan shoes; digital images of Ms. Carr at the crime scene; digital images of Ms. Carr at the autopsy; the autopsy report; [] the USPP Mobile Crime Lab report including photos;" and test impressions of Ms. Carr's Jordan shoes. (*Id.* at 1-2; *see* Case Notes at 1/51-5/51, ECF 40-3.) Forensic examiner Brian McVicker was assigned to conduct a shoe print and tire tread analysis on the evidence. (Opp. at 1.) "Mr. McVicker conducted his examinations

at the Quantico Laboratory and documented his findings in a 13-page report." (*Id.* at 2; *see* McVicker Report, ECF 40-1; Case Notes).

"At trial, the government expects to qualify Forensic Examiner McVicker under Federal Rule of Evidence 702 as an expert in footwear and tire impression examinations." (Opp. at 2.) The Government expects him to offer testimony related to six shoe or tire impressions. (*Id.*) Specifically, it expects him to opine that he reached the following conclusions as to certain shoe and tire impressions:

1. **Source Exclusion** — Ms. Carr's shoes "were excluded as the source of" Footwear Impressions 1, 3, and 5, which were recovered from the front of the Expedition.

2. **Inconclusive** — A herringbone pattern was observed on Footwear Impression 2, which was lifted from the front crossmember of the Expedition, and on Ms. Carr's shoes, but no "determination could be reached as to whether" Ms. Carr's "shoes could or could not have made" the impression due to "limited detail and clarity."

3. **Inclusion Based on Class Characteristics** — Ms. Carr's shoes "could have made" Footwear Impression 4, which was found on the rear sway bar of the Expedition.

4. **Unsuitable** — Patterned Impressions 6 and 7, which were observed on Ms. Carr's jacket and tank top, were "unsuitable for comparison" to the tires of the Expedition due to "limited detail."

5. **Inconclusive** — Tire Impression 8, which was observed on the interior of Ms. Carr's pants, was "similar in tread design" to three of the Expedition's tires, but no "determination could be reached as to whether" the tires "could or could not have made" the impression due to "limited detail and clarity."

3

6.  **Support for Exclusion** — Tire Impression 8 "appear[ed] to not correspond in tread
    design with the" fourth tire of the Expedition.

(*See* McVicker Report at 3-7; Opp. at 2-3.)[1]

Ms. Mason moves to exclude these opinions under Federal Rules of Evidence 702 and 403.
The Court held a two-day hearing on this and other pre-trial motions on March 6 and 7, 2023,
during which it heard testimony from Mr. McVicker as well as Ms. Mason's proffered expert in
shoe print and tire tread analysis, Dr. Alicia McCarthy Wilcox, Ph.D.  Although the Court issued
oral rulings on the other motions at issue, it reserved ruling on the motion to exclude Mr.
McVicker's testimony.

**II. Legal Standards**

   **A.  Federal Rule of Evidence 702**

Under Federal Rule of Evidence 702, a witness "who is qualified as an expert by
knowledge, skill, experience, training, or education" may testify "in the form of an opinion or
otherwise" if: "(a) the expert's scientific, technical, or other specialized knowledge will help the
trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based
on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and
(d) the expert has reliably applied the principles and methods to the facts of the case."

---

[1] FBI policy requires examiners to express forensic feature comparison results using a six-point
scale. (Opp. at 12-13.) Under the FBI's Uniform Language for Testimony and Reports governance
framework, an "examiner may provide any of the following conclusions: 1. Source identification
(i.e., identified) 2. Inclusion based on class and randomly acquired characteristics (i.e., included)
3. Inclusion based on class characteristics (i.e., included) 4. Inconclusive 5. Support for exclusion
6. Source exclusion (i.e., excluded)." *See* U.S. DOJ Uniform Language for Testimony and Reports
for the Forensic Footwear Discipline (2020), https://www.justice.gov/media/1072016/dl?inline;
U.S. DOJ Uniform Language for Testimony and Reports for the Forensic Tire Discipline (2020),
https://www.justice.gov/media/1072041/dl?inline.

A district court's role is to ensure "that an expert's testimony both rests on reliable foundation and is relevant to the task at hand." *Daubert*, 509 U.S. at 597. "This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Id.* at 592–93. This basic gatekeeping obligation applies to all expert testimony, not just scientific testimony. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999).

To be relevant, or helpful, an expert opinion must have a valid connection to the pertinent inquiry. *Belville v. Ford Motor Co.*, 919 F.3d 224, 232 (4th Cir. 2019). To be reliable, an "expert opinion must be based on scientific, technical, or other specialized knowledge and not on belief or speculation, and inferences must be derived using scientific or other valid methods." *Oglesby v. General Motors Corp.*, 190 F.3d 244, 250 (4th Cir. 1999). A district court enjoys wide latitude in determining what indicia of reliability are most useful in a given case. *See Nease v. Ford Motor Corp.*, 848 F.3d 219, 229 (4th Cir. 2017). Those indicia may include: "(1) whether a theory or technique can be (and has been) tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) whether a technique has a high known or potential rate of error;" (4) "whether there are standards controlling [the technique's] application; and" (5) "whether the theory or technique enjoys general acceptance within the relevant community." *Fireman's Fund Ins. Co. v. Tecumseh Prods. Co.*, 767 F. Supp. 2d 549, 553 (D. Md. 2011) (quoting *Kumho Tire*, 526 U.S. at 149–50). Although these factors guide a district court's inquiry, they are not "a rigid test or checklist." *Maryland Cas. Co. v. Therm-O-Disc, Inc.*, 137 F.3d 780, 785 (4th Cir. 1998) (citations omitted). Ultimately, the trial court has discretion to determine whether expert testimony "has a greater potential to mislead than to enlighten." *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 261 (4th Cir. 1999).

### B. *Federal Rule of Evidence 403*

Under Federal Rule of Evidence 403, a district court "may exclude relevant evidence if its probative value is substantially outweighed by a danger" of "unfair prejudice" or "misleading the jury." Unfair "prejudice occurs when there is 'a genuine risk that the emotions of a jury will be excited to irrational behavior, and that this risk is disproportionate to the probative value of the offered evidence.'" *United States v. Wallace*, 124 F. App'x 165, 167 (4th Cir. 2005) (quoting *United States v. Aramony*, 88 F.3d 1369, 1378 (4th Cir. 1996)). Under this standard, "'damage to a defendant's case is not a basis for excluding probative evidence,' because 'evidence that is highly probative invariably will be prejudicial to the defense.'" *Id.* at 167 (brackets omitted) (quoting *United States v. Grimmond*, 137 F.3d 823, 833 (4th Cir. 1998)). The rule requires only "suppression of evidence that results in unfair prejudice—prejudice that damages an opponent for reasons other than its probative value." *Id.* (quoting *United States v. Mohr*, 318 F.3d 613, 619–20 (4th Cir. 2003)).

In the context of applying Rule 403 to expert testimony, the Supreme Court cautioned in *Daubert* that expert "evidence can be both powerful and quite misleading because of the difficulty in evaluating it," and thus "in weighing possible prejudice against probative force under Rule 403," a district court must "exercise[] more control over experts than over lay witnesses." *Daubert*, 509 U.S. at 595.

### III. *Analysis*

The Court analyzes the admissibility of Mr. McVicker's testimony under Rule 702 and Rule 403 in turn. For the following reasons, the Court concludes that Mr. McVicker's opinion is the product of a reliable method capably applied and that his testimony therefore satisfies the

*Daubert* standard. Nevertheless, the Court will exclude certain aspects of his testimony under Rule 403 as substantially more prejudicial than probative.

### A. *Mr. McVicker's Testimony is Admissible Under Federal Rule of Evidence 702*

Ms. Mason moves to exclude Mr. McVicker's testimony as based on an unreliable method. Her central argument is that the FBI follows an outdated protocol for footwear and tire tread analysis that has fallen behind current best practices in the field and no longer produces reliable results.

In Ms. Mason's view, the gold standard for footwear and tire tread analysis is the standard articulated in a draft proposal developed by the National Institutes of Standards and Technology's ("NIST's") Organization of Scientific Area Committees for Forensic Science ("OSAC") and the American Academy of Forensic Scientists' Academy Standards Board ("AAFS"). NIST created OSAC "to address a lack of discipline-specific forensic science standards." *About OSAC*, NIST, https://www.nist.gov/organization-scientific-area-committees-forensic-science. Likewise, AAFS established the Academy Standards Board, or "ASB," to develop "consensus based forensic standards within a framework accredited by the American National Standards Institute." (Draft Standard for Examination and Documentation of Footwear and Tire Impression Evidence at 2, ECF 37-1 ("ASB Draft Standard").) The parties refer to Ms. Mason's proffered draft standard as the "ASB Standard."

Under the ASB Standard, "analysis and documentation of an unknown footwear or tire impression shall be conducted *prior* to the analysis of a known footwear or tire," and the examiner must "annotate" "each suitable impression." (ASB Draft Standard §§ 4.3.1-4.3.2 (emphasis added).) Furthermore, an independent examiner must conduct an "evaluation of the information documented during the comparison of the unknown and known" samples. (*Id.* § 4.5.) The object

of these protocols is to mitigate the risk of "confirmation bias" during the forensic feature comparison process. (Wilcox Report at 3, ECF 37-1.)

Although Ms. Mason acknowledges that the ASB Standard is still in draft form, she argues it should nonetheless control because it has "passed through all" the required "review, modification, [public comment], and publication" processes and "will be published shortly." (Wilcox Rebuttal Report at 3, ECF 43-1.) More to the point, it is not "the standards themselves" that are "dispositive," but the years of "understanding forensic feature comparison methods" they incorporate. (*Id.* at 4.) At bottom, Ms. Mason contends, the ASB draft provides the applicable standard because it reflects a "consensus change in the forensic feature comparison community" and thus best satisfies *Daubert*'s inquiry into controlling standards and general acceptance. (*See id.* at 5.)

As. Mr. McVicker testified, under its current standard operating procedures for footprint and tire tread analysis, the FBI follows the 2006 Scientific Working Group for Shoeprint and Tire Tread Impression Evidence (SWGTREAD) Guide for the Examination of Footwear and Tire Impression Evidence, the Accreditation Requirements for Forensic Science Testing and Calibration Laboratories, and the FBI Laboratory Quality Assurance Manual. These standards do not require an analyst to annotate unknown samples before making a comparison to known samples and do not require a reviewing examiner to conduct an independent examination. Mr. McVicker followed the FBI standard operating procedure in conducting his work on this case, so did not perform the independent annotation or verification procedures the ASB Standard contemplates. As a result, Ms. Mason argues, Mr. McVicker's opinion is unreliable.

The problem with Ms. Mason's theory is that, under *Daubert*, the Court looks to the

8

applicable standards in the field and whether a technique has gained general acceptance in the relevant scientific community. *Kumho Tire*, 526 U.S. at 149. Mr. McVicker testified that, as it stands today, the 2006 SWGTREAD standard remains broadly used and generally accepted in the forensic feature comparison community. Indeed, Ms. Mason's own expert seemed to agree, testifying that the ASB Standard does not yet reflect modern consensus. After all, draft standards, including the ASB Standard, are subject to vigorous public debate and can undergo substantial revision between proposal and publication. Dr. Wilcox testified that the ASB standard itself has been quite "contentious" and underwent "significant[] change[s]" in 2020. Mr. McVicker referred to this iterative process as the basis for the FBI's policy of adopting new protocols only after they are in published form.

The status of the ASB Standard, of course, does not ipso facto render the FBI's current standard operating procedure reliable. Nor does "past acceptance." *United States v. Willock*, 696 F. Supp. 2d 536, 564 (D. Md. 2010) (report & recommendation of Grimm, J.), *aff'd sub nom. United States v. Mouzone*, 687 F.3d 207 (4th Cir. 2012) (internal quotation marks omitted) (To "do so would be equivalent to grandfathering [in] old irrationality."). Dr. Wilcox testified, however, that the FBI's procedure, even if, in her opinion, no longer best in class, is nevertheless reliable. Mr. McVicker testified further that the FBI lab in which he works is accredited by the American National Standards Institute under national and international standards and is subject to routine independent audits under those standards.

Ultimately, Ms. Mason presents compelling evidence of important developments in an ever-evolving field, and Mr. McVicker indicated that the FBI is likely to incorporate those developments as a matter of course once they are memorialized in final and controlling form. The Court will welcome these advancements at the appropriate time, but 'to postpone present in-court

utilization of" of a reliable standard "would be to make the best the enemy of the good." *United States v. Crisp*, 324 F.3d 261, 270 (4th Cir. 2003) (quoting *United States v. Llera Plaza*, 188 F. Supp. 2d 549, 573 (E.D. Pa. 2002)).    Faced with such a tradeoff, *Daubert* instructs that "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof"—not outright exclusion—"are the traditional and appropriate means of" testing expert evidence. *Id.* at 269-70 (quoting *Daubert*, 509 U.S. at 596).    Accordingly, the Court concludes that Mr. McVicker's testimony is admissible under Rule 702.

### B. Mr. McVicker's Testimony is Inadmissible in Part Under Federal Rule of Evidence 403

Ms. Mason also asks the Court to exclude Mr. McVicker's testimony as unduly prejudicial under Rule 403, largely because expert "testimony has a heightened risk of" misleading jurors due to the difficulty laypersons encounter in evaluating expert testimony and "the inevitable credibility given to 'experts' qualified as such by a district court." (Opp. at 17-18 (citing *Daubert*, 509 U.S. at 595).)

Most of Mr. McVicker's testimony is admissible under Rule 403.    Mr. McVicker is expected to testify that Ms. Carr's shoes "could have" been the source of certain footprints lifted from the Ford Expedition, but "were excluded as the source" of others. (McVicker Report at 3-4.) He is expected to testify further that certain patterns were "unsuitable" for comparison to the Expedition's tires, or "appear[ed] to not correspond in tread design with the" Expedition's tires. (*See id.* at 7.)  Such testimony can prejudice Ms. Mason only insofar as it is probative of her guilt. It is also accompanied by appropriate qualifiers: The Government expects Mr. McVicker to testify—and he will only be permitted to testify—that Ms. Carr's shoe prints were included as a *possible* source of Footwear Impression 4 "based on class characteristics," but that "there may be

10

other footwear items with characteristics that are indistinguishable from this shoe that could have also made the impression." (*Id.* at 4.) He is not expected to, and will not be permitted to, testify that Ms. Carr's shoe "is an exact match" with the lift recovered from the Expedition. (*See* Reply in Support of Mot. to Exclude Expert Test. at 10, ECF 43.)

Mr. McVicker's testimony comparing features of known and unknown impressions that ultimately resulted in conclusions of "inconclusive," however, will not be permitted. Mr. McVicker's results were "inconclusive" as to two impressions. First, he opined that a footwear impression lifted from the front crossmember of the expedition "contains a herringbone pattern," and that Ms. Carr's shoeprints contain "herringbone patterns," but that, "due to the limited detail and clarity retained in [the] impression, no determination could be reached as to whether either of [her] shoes could or could not have made [the] impression." (McVicker Report at 4.) Second, he opined that a pattern observed on the interior of Ms. Carr's pants "is similar in tread design to the driver front, driver rear, and passenger front tires" of the Expedition, but that, "due to the limited detail and clarity retained in this impression, no determination could be reached as to whether any of these tires could or could not have made this impression." (*Id.* at 7.) For both, Mr. McVicker provided color-coded annotations comparing possible similarities in patterns between the known and unknown impressions before concluding that the comparisons proved inconclusive. (*See* Gov's Ex. 7 at 25-27, 34-36.)

The comparisons behind Mr. McVicker's inconclusive opinions are substantially more prejudicial than probative. On the probative side of the ledger, there is minimal, if any, probative value in permitting Mr. McVicker to highlight feature comparison similarities that were ultimately too ambiguous for inclusion or exclusion. As for prejudice, however, Mr. McVicker's discussion and depiction of matching "herringbone patterns" and "similar tread designs," accompanied by the

11

credibility of his expert status, poses a serious risk of suggesting to the jury that the shoe and tire prints in question do in fact incriminate Ms. Mason notwithstanding his official designation of "inconclusive." This asymmetry between Mr. McVicker's reported conclusion and the effect the comparison of features underlying that conclusion are likely to have on the jury is precisely the kind of testimony that risks arousing "the emotions of a jury" to the point of "irrational behavior." *Wallace*, 124 F. App'x at 167.

Having weighed the probative value and prejudicial risk of Mr. McVicker's testimony, the Court concludes that Mr. McVicker may testify that his comparison of Ms. Carr's shoes to Footwear Impression 2 and of the Expedition's driver front, passenger front, and driver rear tires to Tire Impression 8 were inconclusive due to the limited detail and clarity retained in the impressions. He will not, however, be permitted to compare features he observed on these impressions with features from known samples.[2]

### IV. Conclusion

For the reasons stated above, the Motion to Exclude Testimony of Brian McVicker, (ECF 36), will be GRANTED in part and DENIED in part.

A separate order follows.

DATED this 20 day of March, 2023.

BY THE COURT:

James K. Bredar
Chief Judge

---

[2] The Court has not been asked to, and does not, address whether testimony that Footwear Impression 2 is *a* footwear impression or that Tire Impression 8 is *a* tire impression would be admissible.